**In the Matter of Thomas R. DAHLBERG.**

Nos. 02S00–9101–DI–8, 98S00–9105–DI–387.

Supreme Court of Indiana.

April 8, 1993.

Charles M. Kidd, Staff Atty., Indianapolis, for Indiana Supreme Court Disciplinary Com'n.

No appearance for respondent.

PER CURIAM.

The Respondent, Thomas R. Dahlberg, was charged in two complaints for disciplinary action with numerous violations of the *Rules of Professional Conduct.* Pursuant to Ind.Admission and Discipline Rule 23(11)(b), this Court appointed a hearing officer who, after a final hearing where the two complaints were considered, tendered his reports on findings of fact, conclusions of law, and recommendations. Although Respondent had actual knowledge of the

time, date and place of hearing, he failed to appear.

Neither the Respondent nor the Disciplinary Commission have challenged the tendered reports, and these matters are now before us for final judgment. When the hearing officer's findings are unchallenged, as in this instance, we accept the findings with the understanding that the ultimate determination rests with this Court. *Matter of Stover–Pock* (1992), Ind., 604 N.E.2d 606.

The Respondent was admitted to the Bar of this state on November 10, 1987, and thus is subject to this Court's disciplinary jurisdiction. He is under a temporary suspension from the practice of law pending the final outcome of this proceeding.

Case number 02S00–9101–DI–8. In this complaint, the Respondent was charged with six counts of misconduct.

Count I. Gary Caibaiosai retained Respondent to defend him on charges of "Operating A Vehicle While Intoxicated", filed on January 22, 1990. Respondent represented to this client that Respondent had a 95% acquittal rate in these cases and that there was a strong likelihood for success in Caibaiosai's case. Caibaiosai paid Respondent a $1,500.00 retainer fee and $600.00 for videotaped expert witness testimony. Later, the Respondent terminated the attorney-client relationship but refused to refund any portion of the retainer and to turn over the videotape.

These findings establish that Respondent violated Ind.Professional Conduct Rule 1.16(d) when he failed to surrender the client's property and to refund the unearned fee. We further conclude that Respondent engaged in conduct prejudicial to the administration of justice and conduct involving dishonesty, fraud, deceit and misrepresentation, in violation of Prof.Cond.R. 8.4(d) and (c).

Count II. In February, 1990, Kevin C. Mask hired Respondent to represent him on charges of "Driving While Intoxicated". As with his other client, Respondent told Mask that he had a 95% acquittal rate. Because of these representations, Mask re-

tained the Respondent. Respondent later indicated that the chances for success were less favorable and requested $900.00 for videotaped expert testimony. On September 5, 1990, Respondent told Mask to appear for a hearing on September 6, 1990, and to meet Respondent prior to the hearing. Respondent himself failed to appear for the hearing, and Mask proceeded without counsel. Respondent later told Mask he had overslept. Mask discharged Respondent who never produced the videotape nor did he return any portion of the retainer fee.

In light of the foregoing findings, we conclude that the Respondent engaged in conduct involving dishonesty, fraud, deceit and misrepresentation, in violation of Prof. Cond.R. 8.4(c); he engaged in conduct that was prejudicial to the administration of justice, in violation of Prof.Cond.R. 8.4(d); and, upon the termination of the employment, he failed to protect his client's interests, in violation of Prof.Cond.R. 1.16(d).

Count III. In May 1989, Lloyd Whitaker retained Respondent to represent him on charges of "Conspiring to Distribute Cocaine". Whitaker was about thirty-six years old at the time charges were brought, but he had been identified in a photographic display from a picture taken when he was seventeen. Whitaker paid Respondent $5,000.00 as a retainer fee of which Respondent was to place $2,000.00 in his trust account for trial expenses and refund any unused funds placed in the trust account.

Respondent presented Whitaker with a plea agreement when he appeared for a pre-trial conference and omnibus hearing. Although it contained no agreement as to length of incarceration, Respondent guaranteed that if Whitaker would plead guilty to "Aiding and Delivery of Schedule I, II, or III Substance", a Class B Felony, he would serve a maximum of six months on work release.

Relying on this assurance, Whitaker plead guilty on June 22, 1989, and was sentenced to ten years, with five years suspended. Immediately after sentence was pronounced, Respondent handed Whit-

aker a hand-written note telling him that Respondent would obtain Whitaker's release within thirty days, even though Respondent had no basis for making this claim. Respondent also knew that Whitaker was sentenced to the Department of Correction, but he told Whitaker's family that he had enrolled Whitaker in a work release program that would not be implemented immediately.

After Whitaker terminated the attorney-client relationship, the Respondent did not refund any portion of the $2,000.00 deposited in his trust account, nor did he provide Whitaker with any accounting of the funds.

We conclude that the Respondent violated Prof.Cond.R. 1.1 by failing to provide competent representation; Prof.Cond.R. 1.4(a) by failing to keep Whitaker reasonably informed about the status of the case; Prof.Cond.R. 1.4(b) by failing to explain the plea agreement to the extent necessary to permit Whitaker to make informed decisions; Prof.Cond.R. 1.15(b) by failing to render a full accounting after termination of the relationship; Prof.Cond.R. 1.16(d) by failing to refund the fee paid by Whitaker for trial expenses upon termination of representation; Prof.Cond.R. 8.4(b) by exerting unauthorized control over the funds designated for trial expenses thereby committing a criminal act reflecting adversely on his honesty, trustworthiness and fitness as a lawyer; and Prof.Cond.R. 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit and misrepresentation.

Count IV. Martha E. Clampitt hired Respondent to represent her on charges of criminal RICO violations in Allen County Superior Court, and Respondent entered his appearance on May 31, 1989. The Allen County prosecuting attorney moved to disqualify Respondent because Respondent had been an Allen County RICO deputy prosecutor at the time the charges were brought against Clampitt and had possessed files pertaining to those charges. The court granted the motion to disqualify.

The Respondent filed a praecipe indicating that he would take an interlocutory appeal of the disqualification order, and Clampitt paid him $500.00 for that purpose.

He filed the interlocutory appeal but it was soon returned because of procedural errors, and Respondent did not refile.

Six months after the disqualification, Clampitt confronted Respondent about the status of her case, and he advised her that the appeal had been denied. Clampitt finally discovered in April of 1990 that Respondent had failed to perfect the appeal.

These findings clearly and convincingly establish that Respondent engaged in prohibited conflict of interest and in deceitful conduct; he failed to refund an unearned fee, neglected his client's case and engaged in conduct prejudicial to the administration of justice, all in violation of Prof.Cond. Rules 1.3, 1.4(a), 1.7(a), 1.7(b), 1.8(k), 1.9(a), 1.16(d), 3.2, 8.4(c), 8.4(d).

Count V. Kathy Knott hired Respondent in December, 1989, to seek recovery for injuries she sustained in an automobile accident. In August, 1990, Knott settled the case for $2,750.00. Respondent advised Knott that Financial Recovery Corporation held a lien of $340.77 against the settlement proceeds, and that Respondent would satisfy the lien from the proceeds. Respondent received and deposited the settlement proceeds into his own bank account on which he wrote a check to himself for $916.67 as attorney fees and a check to Knott for $1,250.44. He did not forward the $340.77 to Financial Recovery Corporation as he had promised to do. After continued demands for payment by Financial Recovery Corporation and Knott's failed attempts to contact the Respondent, Knott satisfied the lien herself.

We find that by his conduct set out under this count, the Respondent exerted unauthorized control over the client's proceeds, and committed an act which reflected adversely on his honesty, trustworthiness and fitness as a lawyer in violation of Prof.Cond.R. 8.4(b). By lying to his client and leading her to believe that he would satisfy the lien, Respondent engaged in conduct involving dishonesty, fraud, deceit and misrepresentation, in violation of Prof.Cond.R. 8.4(c). Such conduct was further prejudicial to the administration of

justice and was violative of Prof.Cond.R. 8.4(d).

Count VI. This count was dismissed upon motion of the Disciplinary Commission.

Case number 98S00–9105–DI–387. Under this case number, the Respondent was charged with four counts of misconduct.

Count I. In April of 1989, Abdul Hamed hired Respondent to seek the refund of a $10,000.00 bond. Hamed became unhappy with Respondent's services and hired another attorney in June, 1989. Later that month, Respondent met with Hamed and Hamed's new attorney and offered to send a draft complaint to the new attorney for his review. On June 22, 1989, the new attorney received a file marked copy of a complaint which Respondent had already filed on Hamed's behalf but without Hamed's permission. Thereafter, the Respondent failed to communicate with Hamed.

On February 13, 1990, Respondent attended a hearing in this action and, the next day, received a U.S. Treasury draft for $10,000.00 issued to Respondent's name, representing the amount of the refunded bond. Respondent deposited this check in his trust account on February 15, 1990. Hamed repeatedly called Respondent, and Respondent finally wrote Hamed a check on August 14, 1990. The check was returned to Hamed due to insufficient funds.

On August 11, 1990, Respondent offered Hamed $10,000.00 in cash but, due to Hamed's reluctance to carry that amount in cash, Respondent's secretary accompanied Hamed to a bank to obtain a cashier's check. Later that month, Respondent told his staff that the firm had to generate $10,000.00 that week in order to pay a client.

As a result of this incident, the Respondent was charged with one count of theft, a Class D Felony. On April 3, 1991, he plead guilty to criminal conversion, a Class A Misdemeanor.

We conclude that, by failing to keep Hamed reasonably informed and failing to comply with reasonable requests for information, the Respondent violated Prof. Cond.R. 1.4(a); by failing to promptly notify Hamed he was holding funds for him and failing to promptly deliver such funds, the Respondent violated Prof.Cond.R. 1.15(b). We further conclude that the Respondent committed a criminal act which reflects adversely on his honesty, trustworthiness and professional fitness, thereby violating Prof.Cond.R. 8.4(b). He engaged in conduct involving fraud, deceit and misrepresentation, and conduct that was prejudicial to the administration of justice, in violation of Prof.Cond.R. 8.4(c) and 8.4(d).

Count II. Respondent represented two codefendants in a joint criminal prosecution heard by a jury. The Respondent withheld exculpatory evidence favorable to one of his clients because it would have been detrimental to the codefendant who was also Respondent's client.

Both clients were convicted, and Respondent agreed to appeal both convictions, representing to one of the clients that success was likely. Respondent later told the same client that the appeal was pending when, in fact, the appeal had not been timely perfected and had been dismissed on May 31, 1990. The client was unaware of this when he wrote to Respondent on June 6, 1990, asking Respondent to forward transcripts and other papers. On June 18, 1990, Respondent wrote to this client demanding $2,400.00 and claiming a lien on the file and transcripts.

Eventually, the client filed a *pro se* petition alleging negligence of counsel. The petition was directed to the State Public Defender and, on November 8, 1990, the pauper appellate counsel filed a praecipe for the record.

These findings convince us that the Respondent failed to act with reasonable diligence, in violation of Prof.Cond.R. 1.3; he failed to provide sufficient information to his client to allow him to make an informed decision, in violation of Prof.Cond.R. 1.4(b); he represented conflicting interests when the representation of one client was seriously limited by the other client's interests, in violation of Prof.Cond.R. 1.7(b); and he

engaged in dishonest and deceitful conduct which was prejudicial to the administration of justice, in violation of Prof.Cond.R. 8.4(c) and Prof.Cond.R. 8.4(d).

Count III. In 1988, Clifford Eaton retained Respondent to pursue a *habeas corpus* proceeding in the United States District Court. Eaton had done considerable research and specifically advised Respondent not to challenge the constitutionality of Indiana's "notice of alibi" statute because the state remedies on that issue had not been exhausted, and this would subject the petition to dismissal.

On January 4, 1989, Respondent filed the "Petition for Writ of Habeas Corpus" in which he challenged the "notice of alibi" statute, despite his client's instructions. The next day, Respondent wrote the federal court to advise that his client's petition for transfer to this court had been denied, and that Respondent would be filing additional pleadings in light of this. However, he never did.

The State responded alleging, among other things, that Respondent's client had not exhausted his state remedies. During the pendency of the proceeding, the client repeatedly attempted to obtain from the Respondent a copy of the State's response, to no avail. On February 22, 1989, Eaton complained to the court that Respondent would not provide him the State's response because Respondent was trying to conceal the errors in the petition. On March 1, 1989, the court ordered Respondent to file a reply to the State's response within fifteen days. Respondent did not comply.

Eventually, Eaton, by new counsel, filed another *habeas corpus* petition. Upon Eaton's *pro se* request, the court dismissed, without prejudice, the first petition prepared by Respondent, and entered an order admonishing him for his behavior in the case.

Once again, the Respondent failed to provide competent, diligent and prompt representation, in violation of Prof.Cond.R. 1.1 and 1.3; he failed to keep his client informed or to comply with the client's reasonable requests for information, in violation of Prof.Cond.R. 1.4(a); he failed to

expedite litigation consistent with Eaton's interests or to abide by the client's decisions, in violation of Prof.Cond.R. 3.2 and 1.2(a), respectively.

Count IV. In July of 1989, Mozelle Olson consulted with Respondent regarding the appeal of a Wisconsin case in which she had been involved. Respondent advised that the case should be appealed to the United States Supreme Court and informed Olson that he had vast experience before that Court and was a close friend of Chief Justice William Rehnquist. He indicated to Olson that this friendship would be a factor in the success of her case. Respondent agreed to represent Olson for $5,000.00 and asked for $2,000.00 as retainer, which retainer Olson paid on July 10, 1989. Respondent cashed Olson's check without depositing it in Respondent's trust account.

The rules governing admission and practice before the United States Supreme Court require that an attorney be admitted to the Bar for at least three years in order to practice before that court. At the time Respondent undertook to represent Olson before the United States Supreme Court, he did not meet this requirement and could not have been admitted to practice before that Court.

Thereafter, Respondent avoided his client and made a series of misrepresentations. He read to his client and her daughter a document purportedly received from the United States Supreme Court, indicating that their pleading had been refused by that court. He informed Olson that July 10, 1989, was the last day for filing the petition (for certiorari) and that he could not get an extension until the Wisconsin Supreme Court denied Olson's petition to reconsider. Olson delivered a denial letter to Respondent on October 3, 1989, but Respondent refused to communicate with her until November 10, 1989. Olson's son-in-law requested the completed "Petition for Writ of Certiorari" from Respondent, but Respondent refused to release any paperwork. On December 8, 1989, Olson received a letter from Respondent stating the petition had been prepared, but would not

be released because Olson had called Respondent a thief.

On December 11, 1989, Olson, with her daughter and son-in-law, inspected a petition at Respondent's office and was surprised to discover the signature of one of Respondent's associates on the petition as counsel. Olson's son-in-law typeset and printed the petition and, on December 22, 1989, delivered it to Respondent for revision. At a meeting on December 26, 1989, Respondent advised that another revision was necessary but that he had already sent an unsigned copy to the clerk of the United States Supreme Court in order to have something on file, which he would follow this up with a *pro se* petition one signed by another attorney.

Eventually, Olson signed the petition and arranged to meet Respondent at the post office where Respondent was to bring money for postage. Respondent failed to meet Olson and, when Olson called, Respondent indicated that he had been drinking and that Olson would have to come and get the money. Olson later discovered from the Clerk of the Supreme Court that her original petition had been returned to Respondent's office due to procedural irregularities and untimeliness. The Court sent Olson forms for filing her petition in *forma pauperis.*

Respondent's numerous ethical violations under this count are established by abundant findings. He violated Prof.Cond.R. 1.1 by failing to provide competent representation; Prof.Cond.R. 1.3 by failing to act with reasonable diligence and promptness; Prof.Cond.R. 1.4(a) by failing to keep Olson reasonably informed about the status of the representation and failing to comply with reasonable requests for information; Prof.Cond.R. 3.2 by failing to make reasonable efforts to expedite litigation; Prof.Cond.R. 8.4(c) and 8.4(d) by engaging in conduct involving dishonesty, fraud, deceit and misrepresentation and conduct that is prejudicial to the administration of justice; Prof.Cond.R. 8.4(e) by stating or implying an ability to influence improperly a court.

Having concluded that Respondent engaged in professional misconduct, we must now assess a sanction. The findings present to us an attorney, not long in practice, who has flagrantly and repeatedly neglected and betrayed his client's interests, betrayed his professional duty, and hindered the administration of justice. The litany of Respondent's abuses violate virtually all professional guidelines. His actions involve criminal conduct and a level of deceit that is intolerable. Balanced against these weighty aggravating factors is the stark lack of mitigators. Under such circumstances, this Court would be remiss in its responsibilities were it to allow this Respondent to continue in the practice of law. Accordingly, we find that this conduct warrants the strongest sanction available. It is therefore ordered that the Respondent, Thomas R. Dahlberg, is hereby disbarred.

Costs of this proceeding are assessed against Respondent.